[Cite as *Webster v. Shaw*, 2016-Ohio-1484.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## WYANDOT COUNTY

SHAILYN WEBSTER, ET AL.,

    PLAINTIFFS-APPELLANTS,

    v.

ROBERT D. SHAW, ET AL.,

    DEFENDANTS-APPELLEES.

CASE NO. 16-15-08

O P I N I O N

Appeal from Wyandot County Common Pleas Court
Trial Court No. 13-CV-0120

**Judgment Reversed**

Date of Decision:  April 11, 2016

APPEARANCES:

    *Ronald A. Annotico* for Appellant

    *J. Alan Smith* for Appellee

**WILLAMOWSKI, J.**

{¶1} Plaintiffs-appellants, Stacy Webster ("Stacy"), and her two minor children, (collectively "Plaintiffs"), bring this appeal from the judgment of the Common Pleas Court of Wyandot County, Ohio, granting a motion for summary judgment in favor of Defendants-appellees, Robert Shaw ("Robert") and Diane Shaw ("Diane") (collectively "the Shaws"). For the reasons that follow, we reverse the trial court's judgment.

### *Factual and Procedural Background*

{¶2} In May 2009, Stacy and her husband, William Webster ("William"), rented a residential property from the Shaws. The property was an older home, from the early 1900s, which was partially renovated by the Shaws. The Shaws did not provide the Websters with federally-mandated lead information or disclosures with respect to the rental property. After about a month, Stacy's two minor children were diagnosed with high lead levels. An inspection of the rental residence, conducted by the Ohio Department of Health in July 2009, revealed that the premises contained lead-based paint. Stacy and her family vacated the residence in October 2009.

{¶3} On December 18, 2013, Stacy and her minor children filed a complaint against the Shaws alleging seven causes of action, including (I) negligence, (II) negligence per se based on violation of state and federal statutes, (III) breach of implied warranty of habitability, (IV) nuisance, (V) breach of

express warranty, (VI) violation of 42 U.S.C. 4852d, and (VII) loss of consortium. (R. at 1.) The Shaws denied the allegations. (R. at 7.) The Shaws also made certain specific denials in their responses to Plaintiffs' First Set of Requests for Admissions. (R. at 8.) Among others, the Shaws denied any awareness that lead paint may be dangerous to humans or that lead paint was used in homes constructed prior to 1978. (*Id.*)

{¶4} The parties engaged in discovery, which included taking depositions of Stacy, William, Diane and Robert. Thereafter, Plaintiffs moved for a partial summary judgment on the issue of liability only as to counts two (negligence per se) and six (violation of 42 U.S.C. 4852d). (*See* R. at 18.) The Shaws opposed summary judgment and filed a cross motion for summary judgment in their favor on all causes of action. (R. at 28.) The parties engaged in additional briefing and jointly requested an extension of the discovery deadline. (*See* R. at 33.) The trial court denied the request and instead proceeded to rule on the parties' motions for summary judgment. The trial court overruled Plaintiffs' partial motion for summary judgment and granted the Shaws' motion for summary judgment, dismissing the complaint.

{¶5} The trial court rejected the negligence, negligence per se, and nuisance claims (counts one, two, and four), on the theory that the Shaws were absolved from liability due to a lack of notice that a lead hazard was present on the premises. With respect to count six, and "any claim in the Complaint" brought

under 42 U.S.C. 4852d, the trial court determined that the minor plaintiffs lacked standing to bring a suit over violation of the federal statute because they "were neither lessees nor purchasers of the rental property," and Stacy "appears to claim no injury other than that which may be derived from lead being discovered in her children's systems." (R. at 40, at 4-5.) The trial court did not expressly address count three—breach of the implied warranty of habitability, count five—breach of express warranty, or count seven—loss of consortium. These counts, or the trial court's failure to expressly address them, are not the subject of the assignments of error or the issues before us. Plaintiffs raise one assignment of error, as quoted below.

### Assignment of Error

THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DEFENDANTS/APPELLEES

### Standard of Review

{¶6} Under Civ.R. 56,

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.

Civ.R. 56(C); *Parrish v. Jones*, 138 Ohio St.3d 23, 2013-Ohio-5224, ¶ 13, quoting Civ.R. 56(C).

{¶7} The party moving for summary judgment has the initial burden "to inform the trial court of the basis for the motion, identifying the portions of the record, including the pleadings and discovery, which demonstrate the absence of a genuine issue of material fact." *Reinbolt v. Gloor*, 146 Ohio App.3d 661, 2001-Ohio-2224, 767 N.E.2d 1197, ¶ 8 (3d Dist.); *accord Todd Dev. Co., Inc. v. Morgan*, 116 Ohio St.3d 461, 2008-Ohio-87, 880 N.E.2d 88, ¶ 12. The burden then shifts to the party opposing summary judgment. *Id.* In order to defeat summary judgment, the nonmoving party may not rely on mere denials but "must set forth specific facts showing that there is a genuine issue for trial." *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, ¶ 10, quoting Civ.R. 56(E).

{¶8} "[B]ecause summary judgment is a procedural device to terminate litigation, it must be awarded with caution." *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358-359, 604 N.E.2d 138 (1992). The court must thus construe all evidence and resolve all doubts in favor of the non-moving party, here Plaintiffs. *Id.* But if the evidence so construed fails to support the essentials of their claims, summary judgment is proper. *Welco Industries, Inc. v. Applied Cos.*, 67 Ohio St.3d 344, 346, 617 N.E.2d 1129 (1993). An appellate court reviews de novo a

trial court's decision on a motion for summary judgment. *Esber Beverage Co. v. Labatt USA Operating Co., L.L.C.*, 138 Ohio St.3d 71, 2013-Ohio-4544, ¶ 9.

### *Analysis*

{¶9} Challenging the trial court's ruling on appeal, Plaintiffs focus on the theory of negligence per se and make no contentions with respect to the common law negligence claim, as asserted in count one of the complaint, or with respect to the remaining counts of the complaint. Indeed, the claim for violation of 42 U.S.C. 4852d, originally presented in count six of the complaint, is not argued separately on appeal. Instead, Plaintiffs allege that violation of this federal statute constitutes negligence per se.[1]

{¶10} "The concept of negligence per se allows the plaintiff to prove the first two prongs of the negligence test, duty and breach of duty, by merely showing that the defendant committed or omitted a specific act prohibited or required by statute." *Lang v. Holly Hill Motel, Inc.*, 122 Ohio St.3d 120, 2009-Ohio-2495, 909 N.E.2d 120, ¶ 15, citing *Chambers v. St. Mary's School*, 82 Ohio St.3d 563, 565-566 1998-Ohio-184, 697 N.E.2d 198. But the plaintiff in a negligence per se action still has to prove proximate cause and damages. *Sikora v. Wenzel*, 88 Ohio St.3d 493, 496, 2000-Ohio-406, 727 N.E.2d 1277. Additionally, "a negligence-per-se violation will not preclude defenses and excuses, unless the

---

[1] As indicated above, although count six alleged a violation of 42 U.S.C. 4852d as a separate cause of action, this federal statute was also included among other statutes that formed basis for the negligence per se claim in count two of the complaint. (*See* R. at 1, ¶ 10.) It was also the subject of the summary judgment briefing. (*See* R. at 18, at 8-9; R. at 28, at 11.)

statute clearly contemplates such a result." *Robinson v. Bates*, 112 Ohio St.3d 17, 2006-Ohio-6362, 857 N.E.2d 1195, ¶ 23.

{¶11} Here, Plaintiffs' negligence-per-se claims are based on R.C. 5321.04. This statute lists ten obligations of a landlord who is a party to a rental agreement. Among others, and as singled out by Plaintiffs on appeal, the statute requires that the landlord:

> (1) Comply with the requirements of all applicable building, housing, health, and safety codes that materially affect health and safety;
>
> (2) Make all repairs and do whatever is reasonably necessary to put and keep the premises in a fit and habitable condition.

(App't Br. at 12, quoting R.C. 5321.04.) Plaintiffs claim that the presence of lead on the premises rendered the property "unfit or in an uninhabitable condition," in violation of R.C. 5321.04(A)(2). (App't Br. at 12.) They further assert that the Shaws violated R.C. 5321.04(A)(1) by not complying with the federal statute concerning lead disclosures, 42 U.S.C. 4852d.

{¶12} The Ohio Supreme Court has recognized that "[a] landlord's violation of the duties imposed by R.C. 5321.04(A)(1) or 5321.04(A)(2) constitutes negligence *per se,* but a landlord will be excused from liability under either section if he neither knew nor should have known of the factual circumstances that caused the violation." *Sikora* at syllabus. The issue reviewed by the trial court and raised on appeal is whether the Shaws knew or should have known of the factual circumstances that rendered the rental property at issue unfit

or uninhabitable. More specifically, did the Shaws know or should they have known that lead-based paint was present on the premises. *See Trammell v. McDonald*, 3d Dist. Defiance No. 4-04-15, 2004-Ohio-4805, ¶ 14 (holding that under subsection (A)(2) of R.C. 5321.04, "[a] tenant must show that the landlord had actual or constructive knowledge of the actual defect in order for liability to attach under this subsection"); *Rice v. Reid*, 3d Dist. Crawford No. 3-91-34, 1992 WL 81424, *1 (Apr. 23, 1992) ("Notice to the landlord that a problem exists is necessary before liability can be imposed on a landlord, pursuant to R.C. 5321.04."); *id.* at 3 ("it would be unfair to impose liability on a landlord for the presence of lead based paint and its resulting injuries *unless* he has notice that such paint is present on his premises" (emphasis sic.)).

*Notice of Lead-Based Paint on the Premises*

{¶13} Ohio law recognizes that the notice of the defective condition on the property may be actual or constructive. *See Sikora*, 88 Ohio St.3d at 495, 2000-Ohio-406, 727 N.E.2d 1277; *Rice* at *2. The difference between the two types of notice has been explained by some courts in terms relating to "the manner in which notice is obtained or assumed to have been obtained." *In re Fahle's Estate*, 90 Ohio App. 195, 105 N.E.2d 429 (6th Dist.1950), syllabus; *Manning v. Dept. of Transp.*, 10th Dist. Franklin No. 96API07-931, 1997 WL 202270, *2 (Apr. 24, 1997); *Howley v. Wythe Par. Homeowners Ass'n, Inc.*, 2d Dist. Montgomery No. 12506, 1991 WL 228708, *3 (Oct. 2, 1991). The Sixth District Court of Appeals

observed that the actual notice includes "notice that a specific condition exists and that it is harmful" as well as " 'knowledge or information of facts sufficient to put a prudent man upon inquiry.' " *Richardson v. Boes*, 6th Dist. No. L-08-1015, 179 Ohio App.3d 418, 2008-Ohio-6173, 902 N.E.2d 77, ¶ 29, quoting *G/GM Real Estate Corp. v. Susse Chalet Motor Lodge of Ohio, Inc.*, 61 Ohio St.3d 375, 380, 575 N.E.2d 141 (1991); *see also Johnston v. Faith Baptist Church, Inc.*, 3d Dist. Allen No. 1-87-14, 1989 WL 43017, *6 (Apr. 26, 1989) (reviewing various definitions of the term "notice").  Constructive notice can be imputed when it appears that a condition "existed in such a manner that it could or should have been discovered, that it existed for a sufficient length of time to have been discovered, and that if it had been discovered it would have created a reasonable apprehension of a potential danger or an invasion of private rights." *Beebe v. City of Toledo*, 168 Ohio St. 203, 151 N.E.2d 738 (1958), paragraph two of the syllabus; *see also Faith Baptist Church, Inc.*, at *6-7; *Johnston v. Filson*, 12th Dist. Clinton No. CA2014-04-007, 2014-Ohio-4758, ¶ 11 (" 'Actual notice' " is defined as notice 'given directly to, or received personally by, a party.' *Black's Law Dictionary,* 1090 (8th Ed.2004). 'Constructive notice' is notice 'arising by presumption of law from the existence of facts and circumstances that a party had a duty to take notice of.' *Id.*").

{¶14} The trial court in this case determined that "there are insufficient facts to impute notice of a hazardous condition, either actual or constructive, to the

Defendants." (R. at 40.) The trial court's holding in effect meant that the Shaws established a lack of notice and that Plaintiffs had no sufficient facts to dispute the Shaws' assertion that they did not know, nor should have known of the lead presence on the premises. We start our de novo review by looking at the facts relevant to the notice requirement in the light most favorable to Plaintiffs.

{¶15} The Shaws have been in the rental business since 1993 and they own several rental properties. (R. Shaw Dep. at 11.) The Shaws bought the rental property at issue in 1993 and they never had the house inspected. (*Id.* at 12, 28.) They performed certain fixes and upgrades on the house upon purchasing it in 1993. (*Id.* at 13.) Some improvements were also performed in 2009, prior to Plaintiffs moving in. (*Id.* at 20-21.) In May 2009, the Shaws executed a written lease agreement with Stacy and William. The document included "a lead paint disclosure saying this house, if it was built before [1978], it could have lead." (*Id.* at 30.) The disclosure further stated that lead-based paint "may place young children at risk of developing lead poisoning," which "may produce permanent neurological damage." (Def. Ex. C.)

{¶16} In his deposition, Robert testified that he was aware that the house had been built in the early 1900s. (R. Shaw Dep. at 20.) At the time when he was renting the property to the Websters, Robert knew that lead had been used in paint, but he was not aware that lead was toxic to humans. (*Id.* at 32.) Robert further testified that prior to this case being filed he never researched Ohio laws about

landlords and tenants, never heard of the Ohio Landlord-Tenant Act, and he had no idea that federal law required him to provide lead disclosure statements to his tenants. (*Id.* at 17-18, 31.) In fact, he testified that he had no idea that anything like lead hazard pamphlets or information about lead even existed. (31-32.) Upon learning that the house had lead problems, Robert participated in a lead abatement course and performed lead abatement on the property. (*Id.* at 11, 17-19.)

{¶17} Robert testified that he was "sure there was some" chipping or peeling paint on the property in May 2009. (*Id.* at 23-24.) He admitted that the paint on the porch was chipping when the Websters moved in and that he promised to paint it. (*Id.* at 25.) He testified that the paint was from the 1950s and it was "government-issued paint." (*Id.* at 25.) He further stated, "Don't know if it had lead. Probably did. * * * as far as I know, before '78 a lot of paint had lead in it." (*Id.* at 26.) But he added that he only knew that because of the lead abatement class that he took after being notified of the lead problem on his property, "[b]efore that it was never anything you ever thought about." (*Id.* at 26.) In spite of reading newspapers and watching the news, Robert claimed he never learned about lead hazards or the dangers of lead poisoning, until he received a letter from the State of Ohio in the instant case. (*See id.* at 9, 17, 48.) Furthermore, in spite of reading the lease, he claimed to have no knowledge of the possibility of lead-based paint on the premises. (*Id.* at 29-31.) He stated, "I was aware that it said it could have lead paint, but I had no idea what that even meant." (*Id.* at 30.) He

explained this deficiency by saying that the lease agreement was "a form letter," purchased at "Office Max or somewhere like that." (*Id.* at 29, 31.)

{¶18} Diane's deposition largely confirmed the facts in Robert's testimony. (*See* D. Shaw Dep.) Diane additionally testified that none of their other rental properties had any issues with lead paint. (*Id.* at 28.) She testified that she had never been to any kind of educational seminars for landlords and never learned how to run a rental business. (*Id.* at 29.) Diane read the lease agreement, which included the lead disclosure statement. (*Id.* at 45.) She admitted that the property at issue was constructed prior to 1978 and that paragraph fifteen of the lease stated that a residential dwelling built prior to 1978 "may present exposure to lead from lead-based paint." (*Id.* at 53.) She claimed, however, that paragraph fifteen did not give her notice that her property might contain lead-based paint. (*Id.* at 52, 53.) Like Robert, Diane had little knowledge about lead and "never thought of it" before 2009. (*Id.* at 50.) She was not aware of any federal laws concerning documents that needed to be provided to tenants. (*Id.* at 57.) She believed the property was safe for tenants when she rented it to the Websters. (*Id.* at 56-57.)

{¶19} In addition to Robert and Diane's depositions, the trial court relied on their affidavits attached to the cross-motion for summary judgment. (*See* R. at 28.) The affidavits indicated that the premises at issue had been rented to families with young children before and that no prior tenants had ever been diagnosed with lead poisoning or reported lead exposure from the residence. (*Id.*, R. Shaw Aff. at

¶ 9; D. Shaw Aff. at ¶ 9.)   They further indicated that before this case, "[n]o government housing agency or health agency had ever performed a lead inspection" on the premises and they had never received any notices concerning the possibility of lead in this residence.  (*Id.* at ¶ 10.)

{¶20} On behalf of Plaintiffs, Stacy testified in her deposition that she contacted the Shaws to tell them about the lead problem when she "knew both kids had high lead," which was before July 17, 2009, and before the Department of Health conducted the home visit and found lead on the property.  (S. Webster Dep. at 82.)  Stacy testified that when she later informed Robert that lead was found in the house, "his response was, well, what did you do, let them lick the walls?"  (*Id.* at 59.)   She further testified that Robert made a comment indicating that "they wouldn't have found out about the lead" if he had not rented to someone on welfare, because he assumed that "it was because of welfare" that the children got tested for lead.  (*Id.* at 59.)  No exact date of this conversation was provided, and it is unknown whether it occurred before or after the Shaws received the letter from the Department of Health informing them about lead presence on their premises. Stacy testified, however, that she had called Robert twice.  "The first time letting him know that my children had high lead levels," which was before the lead testing in the house.  (*Id.* at 61-62.)  Stacy did not recall any statements made by Robert during the first call.  (*Id.* at 62.)  The second call was when Stacy "let him know there's lead paint top to bottom, the entire house. * * * That's when he got

upset" and made the statements at issue. (*Id.* at 59, 62.) There is some evidence about a phone call from Robert to Stacy around July 30, indicating that the Shaws had received the letter from the Ohio Department of Health, which according to Robert was the first time he received any notice about lead hazards or the dangers of lead poisoning. (*Id.* at 17, 86; Def. Ex. D.)

{¶21} Stacy did not recall any other statements made by the Shaws about the issue of lead on the property. (S. Webster Dep. at 60, 63.) She conceded that the Shaws never admitted to her that they had known the house had lead in it. (*Id.* at 150.) When asked whether she had any reason to believe that the Shaws were aware of the presence of lead, Stacy responded, "Upon the comment of, well, what did you do, let your kids lick the walls, yeah, I kind of feel like he knew." (*Id.* at 150.) She construed it as an admission. (*Id.* at 151.)

{¶22} Stacy's husband, William testified in his deposition that when the family moved in, on the first day, they had a conversation with Robert about the paint on the front porch. (W. Webster Dep. at 31.) He stated that the paint on the porch was "all bubbled; and every time you walked through, it like [tracked] in with you wherever you went." (*Id.* at 31-32.) William testified that Robert rejected their offer to paint the porch by themselves. (*Id.* at 32.) William had no other discussions with Robert about the topic. (*Id.* at 34.) He did not recall any statements made by the Shaws indicating that they had knowledge about the lead presence in the house at the time. (*Id.* at 34.)

{¶23} The trial court's conclusion based on these facts indicated that no reasonable jury could "impute notice of a hazardous condition, either actual or constructive, to the Defendants." (R. at 40, at 9.) We disagree. The facts in the record, when viewed in the light most favorable to Plaintiffs, cast some doubt on Robert's assertions of complete ignorance as to the lead issues before his taking the lead abatement classes. They also cast doubt on the trial court's statement in the judgment entry that "Defendants were first notified that the rental home may contain lead" following an inspection by the Department of Health. (R. at 40, at 3.) Stacy testified that she contacted Robert twice: first after she found out about the children's high lead levels, which was *before* the inspection by the Department of Health, and second, after the inspection, to inform Robert that lead was found in the house. While the inspection by the Department of Health *confirmed* that the house contained lead, the first phone call from Stacy might have been the time when the Shaws were *first* notified that the rental home *may* contain lead.

{¶24} Similarly, Robert's statement to Stacy about the children licking walls casts doubt on his testimony that he only knew about lead being present in paint because of the lead abatement class, which he took *after* being notified of the lead problem on his property. Although it is possible that Robert made the comment after he had received the letter from the Department of Health, which gave him some knowledge of the lead existence and its dangers, we do not have actual dates of the letter receipt or the conversation in the record and summary

- 15 -

judgment standard requires us to resolve the doubts in favor of non-movants. Further, his comment that "they wouldn't have found out about the lead," suggests a possibility that Robert wanted to hide the existence of lead on the premises. (S. Webster Dep. at 59.)

{¶25} Another doubt that must be resolved in favor of Plaintiffs comes from Robert and Diane's acknowledgments that they had read the lease and the lead paint disclosure, which talked about lead hazards in houses built prior to 1978, but they had absolutely no indication that their property, which was built prior to 1978, could pose such hazard. Finally, Stacy disputed Robert's assertion of the lack of notice based on his comments to her, which created a conflict in evidence that must be resolved by a trier of fact. (*See* S. Webster Dep. at 150, 151.)

{¶26} While the above facts do not necessarily prove that the Shaws knew about lead presence on the property, they create a genuine issue on the material fact of whether the Shaws had actual or constructive notice of the lead being present on their property.

{¶27} We recognize that the trial court's decision was based on several appellate opinions in which the courts found that defendants proved lack of notice as a matter of law. The first case on which the trial court relied was a landlord-tenant case involving lead poisoning from our sister district, *Patterson v. Ahmed*, 6th Dist. Lucas No. L-09-1222, 2010-Ohio-4160. In that case, the plaintiffs were

"Section 8 program" beneficiaries, which meant that the Lucas County Metropolitan Housing Authority inspected the house before the plaintiffs moved in. *Id.* at ¶ 3-4. It was "undisputed" that "the home passed the inspection required by the Section 8 program prior to appellants' tenancy," and that the inspection "looked for chipping, peeling, or cracking paint," in order to assess "conditions strongly associated with lead-based paint poisoning." *Id.* at ¶ 4, 68. The plaintiff-tenant testified that the paint was in good condition when she first moved into the home, and she did not notice peeling and chipping paint until later into her tenancy. *Id.* at ¶ 27. She did not ask the landlord to paint any portion of the property until after increased lead levels were found in her children's blood. *Id.* at ¶ 26, 31, 53-56.

{¶28} The *Patterson* court presumed for summary judgment purposes that lead-based paint was present on the property at some point when the plaintiffs resided there, even though there was no evidence of its presence at the commencement of the lease. *Id.* at ¶ 11. The court also acknowledged that the landlord had multiple rental residences and he had a "real estate salesperson" license, which he obtained in the early 1990s, but he did not work as a real estate agent. *Id.* at ¶ 4, 26. Although according to the landlord's testimony, the licensing classes or test "never covered the issue of lead-based paint," the court charged the landlord "with constructive knowledge of the hazards of lead-based paint in housing, particularly as they relate to children," based on local housing

regulations. *Id.* at ¶ 24, 26. Yet, as to the issue of notice that the lead-based paint was present on the rental premises at issue, the record "only support[ed] a finding that appellees neither knew nor should have known" of it until after the plaintiff's children had been diagnosed with lead poisoning. *Id.* at ¶ 66. The court refused to impute constructive notice of the paint being present on the premises, in spite of the landlord's real estate knowledge or experience. *Id.* at ¶ 69-71. The court noted lack of any evidence that the scope of his real estate training or experience should have put him on notice *that this particular property contained lead-based paint*, especially considering the inspection and lack of any chipping and peeling paint on the premises at the commencement of the tenancy. *Id.* at ¶ 69-71.

{¶29} This case is similar to *Patterson* in that it involved an experienced landlord who nevertheless denied any knowledge of "the dangers of lead-based paint," until the beginning of the case at issue. *Id.* at ¶ 26. But the facts pertaining to the presence of the lead hazard in the particular residence at issue differ. In *Patterson*, the testimony was undisputed that no chipping or peeling paint was noticed by anyone until some time after the tenant moved into the premises. The issue of painting the premises in that case was not raised until after the children had been diagnosed with lead poisoning. Finally, and most importantly, the landlord in *Patterson* had an affirmative assurance that his property was lead-free, in the form of an inspection by the Housing Authority. That inspection contradicted an inference of a constructive notice "that a lead-based paint hazard

existed on the property." *Id.* at ¶ 68. In fact, the *Patterson* court held that the passed inspection was such a strong evidence of the absence of a lead hazard on the premises at the beginning of the plaintiff's tenancy that even the fact that the landlord received "written information regarding lead-based paint and the potential health hazards that might be caused by peeling, chipping, and flaking lead-based paint particles," was not sufficient to impute constructive notice to the landlord. *Id.* at ¶ 68. Indeed, in the absence of peeling, chipping, and flaking paint, information about "the potential health hazards that might be caused by peeling, chipping, and flaking lead-based paint particles" is not relevant to the issue of whether the property owner knows of a lead hazard on the premises. *See id.*

{¶30} In the instant case, it is undisputed that the chipping and peeling paint was present and pointed out to Robert at the beginning of the lease. Stacy and William requested that the porch be painted *before* lead was discovered in the children's system. Coupled with the disclosure in the lease, it could have served as evidence of notice to the Shaws that there was a lead hazard on the premises. *See id.* at ¶ 20 (holding that when combined with other evidence, notice that paint is chipping and peeling is "relevant" to the "question of whether the landlord knew or should have known of the hazard of lead-based paint exposure on his premises," although it is not, by itself evidence of notice for the purpose of liability), quoting *Lowery v. Ondrus*, 6th Dist. Lucas No. L-08-1100, 2009-Ohio-

46, ¶ 24; *accord Walker v. Barnett Mgt., Inc.*, 8th Dist. Cuyahoga No. 84188, 2004-Ohio-6632, ¶ 56. Additionally, although the trial court construed the Shaws' affidavits attesting that no prior tenants ever reported lead exposure as akin to the "positive notice" in *Patterson* that "the rental unit had passed an inspection by governmental body," we find the two notices to differ significantly. (R. at 40, at 7.) The affidavits of Robert and Diane do not refer to a "positive notice" given to them by any third party, but rather to a lack of a "negative" notice. Unlike the evidence of the inspection reports in *Patterson*, the affidavits here did not indicate that anyone had looked for lead-based paint hazards or that any of the prior tenants had ever been tested for lead. The Shaws attested that the property had never been professionally inspected. Therefore, the affidavits that no one had ever asked about or reported lead concerns, are not tantamount to the affirmation that the house passed a lead inspection performed by a governmental agency. For all these reasons, we conclude that reliance on *Patterson* is misplaced.

{¶31} The second case on which the trial court relied comes from the Twelfth District Court of Appeals and concerns an injury caused to a tenant by a tree growing on the rented property. *See Johnston v. Filson*, 12th Dist. Clinton No. CA2014-04-007, 2014-Ohio-4758, ¶ 2. The tree "was approximately 40-50 years old and it had a " 'v-crotch' " split, which was later determined to contain decay; but at the time of the incident "the tree was alive and had green needles on it." *Id.* at ¶ 3. The testimony of the landlord indicated that he visited the property

and inspected it visually, that "the tree looked 'okay' before it fell," and that there were no prior indications that the tree required attention. *Id.* at ¶ 15-16. The plaintiffs-tenants also testified that they had had no concerns or worries about the tree at issue prior to the accident. *Id.* at ¶ 18, 20. Even though they had noticed an area of discoloration on the tree, they believed that the spot was sap and they never reported it or complained about it to the landlord. *Id.* at ¶ 19, 20. One of the tenants would lounge under the tree in a hammock despite seeing the dark spot, and she never observed anything indicating that the tree was in decay or dying. *Id.* at ¶ 20. Although the plaintiffs complained to the landlord about other conditions of the property, they never reported or complained about the condition of this tree. *Id.* at ¶ 18, 21. A neighbor to the rental property testified that he had had no concerns about the tree prior to the accident and he had not noticed any evidence of rot on the tree before it fell. *Id.* at ¶ 22. An expert arborist testified about the dark spot that was later discovered to be rot and indicated that "it would have been 'pretty difficult' to see the spot because it was 'way up in the air.' " *Id.* ¶ 23-24. Although the expert also testified that all trees with the "v-crotch" split would *eventually* fall, there were no "signs that it was about to fall or break during a strong wind storm and strike one of the tenants." *Id.* at ¶ 27.

{¶32} The court in *Filson* concluded that based on the testimony of all witnesses, none of the usual indicia of the tree damage or tree hazard were present, because "the tree was alive before it fell, and * * * it had living branches, healthy

- 21 -

bark, and green needles. The tree did not contain noticeable holes, as if termite damage had occurred. Nor did the tree show any signs of decay or disease other than a small colored patch [the plaintiffs] thought was sap." *Id.* at ¶ 13, 25. Additionally, both plaintiffs testified that "there was never any cause for concern that the tree would fall in their backyard." *Id.* at ¶ 26. Accordingly, the court concluded that summary judgment was proper because "the testimony [did not] establish that the [defendants] knew or should have known that the tree posed a possible danger." *Id.* at ¶ 25.

**{¶33}** In the instant case, unlike in *Filson*, the usual indicia of hazard, in the form of the peeling and chipping paint, were present. Unlike the tree that looked "alive" and was never reported to the landlords, the condition of the paint did not falsely indicate that it was safe, and its peeling and chipping condition was reported to the Shaws. Additionally, in *Filson*, there was no evidence of any disclosures that could put the landlord on notice that a fifty-year-old tree with a dark spot on it could contain rot or could create a hazard. Accordingly, this case is distinguishable from *Filson*.

**{¶34}** Based on the foregoing, we find a genuine issue of material fact as to whether the Shaws had actual or constructive notice of lead being present on the rental property. Therefore, we hold that the trial court erred in granting summary judgment in this case relying on the lack of notice that lead-based paint was present on the premises.

*Violation of 42 U.S.C. 4852d*

**{¶35}** The second issue on appeal concerns the Residential Lead-Based Paint Hazard Reduction Act of 1992 ("RLPHRA"), codified in 42 U.S.C. §§ 4851-4856. This federal statute requires that

> before the purchaser or lessee is obligated under any contract to purchase or lease the housing, the seller or lessor shall--
>
> (A) provide the purchaser or lessee with a lead hazard information pamphlet, as prescribed by the Administrator of the Environmental Protection Agency under section 406 of the Toxic Substances Control Act [15 U.S.C.A. § 2686];
>
> (B) disclose to the purchaser or lessee the presence of any known lead-based paint, or any known lead-based paint hazards, in such housing and provide to the purchaser or lessee any lead hazard evaluation report available to the seller or lessor; and
>
> (C) permit the purchaser a 10-day period (unless the parties mutually agree upon a different period of time) to conduct a risk assessment or inspection for the presence of lead-based paint hazards.

42 U.S.C. 4852d(a)(1). The statute further provides that

> Any person who knowingly violates the provisions of this section shall be jointly and severally liable to the purchaser or lessee in an amount equal to 3 times the amount of damages incurred by such individual.

42 U.S.C.A. 4852d(b)(3). It is undisputed that the Shaws did not provide Plaintiffs with the "lead hazard information pamphlet" or make disclosures about any known lead-based paint hazards, as required by the statute.

**{¶36}** Addressing the allegations with respect to RLPHRA, the trial court reasoned that under the statute, "[r]esidents of property, who are not lessees of the

- 23 -

property, are not included" within a group of people who may bring suit over failure to provide the lead information pamphlet.[2] (R. at 40, at 4.) Therefore, the trial court concluded that the minor children had no standing to bring a suit for violation of 42 U.S.C. 4852d. (*Id.* at 5.) Furthermore, because Stacy "appear[ed] to claim no injury other than that which may be derived from lead being discovered in her children's systems," the trial court found Stacy's claims under RLPHRA to be without merit. (*Id.* at 4; *see also id.* at 9.) The trial court stated that it granted summary judgment "for any claim in the Complaint brought under a violation of Revised Code Section 426 [sic] U.S.C. Section 4852d by the minor children." (*Id.* at 5.) Plaintiffs only appeal the grant of summary judgment for violation of 42 U.S.C. 4852d as it relates to the negligence per se claim, which was asserted in count two of the complaint. (*See* App't Br. at 5, 26.) They do not raise the issue of whether the trial court correctly decided that the minor children lacked standing to sue in count six and we do not address it here.[3]

{¶37} We also note that the trial court did not address the question, raised by the Shaws on appeal, whether 42 U.S.C. 4852d could give a basis for a negligence per se claim. Instead, the trial court summarily dismissed the claim finding that Stacy could not maintain a cause of action because she did not "appear" to claim any injury to herself, and her claims for the children's injuries

---

[2] We note that on July 16, 2015, a bill was introduced to amend RLPHRA "to make violators of such section liable to residents and invitees of target housing for such violations, and for other purposes." 2015 CONG US HR 3085, available at https://www.congress.gov/bill/114th-congress/house-bill/3085.
[3] *But see* note 2 above.

failed because the children had no standing. In its reasoning, the trial court relied on a case from the Sixth Circuit Court of Appeals, *Roberts v. Hamer*, 655 F.3d 578 (6th Cir.2011). In *Roberts*, a mother brought an action "solely as the next friend of her two minor children." *Id.* at 578. Although the mother attempted to amend the complaint to assert a claim in her own capacity, the trial court rejected the amendment due to the expiration of the statute of limitations. *Id.* at 579. The issue before the federal court of appeals was whether the children were entitled to seek redress for their injuries that were allegedly caused by the violations of RLPHRA, despite their status as neither purchasers nor lessees. *Id.* at 582. The court held that children could not "sue a lessor for violations of the RLPHRA's disclosure requirements," because the statute limited availability of the cause of action to the purchasers or lessees. *Id.* at 579, 583, 585. Notably, the court in *Roberts* made no determination as to whether the mother would have been able to recover for the violation had she alleged the claims in her own name. Therefore, *Roberts* does not resolve all issues in the instant case.

{¶38} Here, the trial court determined that Stacy "appears to claim no injury other than that which may be derived from lead being discovered in her children's systems." (R. at 40, at 4.) The record confirms this finding as far as lack of *physical* injuries to Stacy. (*See, e.g.*, S. Webster Dep. at 123, 147-148.) Yet, the statute does not limit recovery to physical injuries to the lessee that stem from lead poisoning. Instead, it provides for compensation for "damages

incurred" by the lessee that result from the violation. 42 U.S.C. 4852d(b)(3); *see Roberts* at 582 (recognizing that "RLPHRA authorizes private enforcement through civil actions" and that the tenant may be able to recover "an amount equal to 3 times the amount of damages incurred by such individual"), quoting 42 U.S.C. 4852d(b)(3); *Kearney v. Elias*, D. New Hampshire, No. 07-cv-149-JL, 2008 WL 3502116, *5-6 (Aug. 11, 2008) (observing that "[n]either the statute nor its implementing regulations contain any definition of the phrase 'damages incurred,' " but concluding that claimed injuries must have causal connection to the alleged violations of 42 U.S.C. 4852d, and finding genuine issues of fact material as to whether "the plaintiffs would have suffered some financial injury traceable to the defendants' own nondisclosure"); *McCready v. Main St. Trust, Inc.*, C.D. Illinois, No. 07-CV-2096, 2008 WL 3200651, *3 (Aug. 5, 2008) (recognizing that "[a] private plaintiff may recover compensatory damages under the RLPHRA," but denying the remedy because the plaintiffs did not uncover any lead paint and incurred no costs "as a result of the alleged violation of the statute").

{¶39} The record discloses an issue of fact as to the damages incurred by Stacy, other than her own physical injuries, and as to whether these damages were incurred as a result of the alleged violation of the statue. (*See, e.g.*, S. Webster Dep. at 81-82 (testifying about a purchase of "a brand-new expensive sweeper" and cleaning on a daily basis to contain the lead contamination); *id.* at 146

(testifying about paying out of pocket for "prescriptions here and there that's not covered"); Def. Ex. K, S. Webster Resp. to Interrog. at 4, 17, 29 (responding that Stacy suffered loss of consortium, mental anguish, and emotional distress); *but see id.* at 6 (indicating lack of any non-medical expenses stemming from "the incident described in the Complaint")). Accordingly, the trial court's grant of summary judgment to the Shaws based on a finding that Stacy could not sustain the claim due to lack of injuries independent of her children's claims must be reversed.[4]

{¶40} For all of the forgoing reasons we sustain the assignment of error.

### *Conclusion*

{¶41} Having reviewed the arguments, the briefs, and the record in this case, we find error prejudicial to Appellants in the particulars assigned and argued. The judgment of the Common Pleas Court of Wyandot County, Ohio is therefore reversed and the case is remanded to the trial Court for further proceedings consistent with this opinion.

*Judgment Reversed and*
*Cause Remanded*

**SHAW, P.J. and PRESTON, J., concur.**

**/hls**

---

[4] We emphasize that this opinion is limited to the issues addressed by the trial court and challenged on appeal. We do not reach the multitude of issues raised by the parties and not addressed by the trial court as they are not necessary to the determination of whether the trial court properly granted summary judgment to the Shaws.